**08 CV 3904**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
SAMUEL A. STOCKHAMER and ALICE L.          :
STOCKHAMER, on Behalf of Themselves        :
and All Others Similarly Situated,         :
                                           :     No.
                    Plaintiffs,            :     ECF CASE
                                           :
        v.                                 :     **CLASS ACTION COMPLAINT**
                                           :
CITIGROUP, INC. and CITIGROUP GLOBAL       :     **JURY TRIAL DEMANDED**
CAPITAL MARKETS, INC.                      :
                                           :
                    Defendants.            :
-----------------------------------------------------------x

RECEIVED
APR 25 2008
U.S.D.C. S.D. N.Y.
CASHIERS

## NATURE OF THE ACTION

1.      Plaintiffs Samuel A. Stockhamer and Alice L. Stockhamer, clients of Defendant

Citigroup, Inc.'s ("Citigroup") brokerage subsidiary, Citigroup Global Capital Markets, Inc.

("CGCM" or "Smith Barney"),[1] brings this class action on behalf of themselves and all others

similarly situated, by their attorneys, Schoengold Sporn Laitman & Lometti, P.C., for their class

action complaint against Defendants Citigroup and CGCM (collectively, the "Defendants").  It is

alleged that Defendants' well-known and allegedly reputed investment and "Financial Advisors"

engaged in a deceptive and misleading plan and scheme whereby Defendants violated the trust

and confidence placed in them by their clients, and caused, allowed and permitted their clients

who reposed confidence in them, to have their monies placed in Auction Rate Securities

("ARSs"), investment vehicles touted by Defendants as "cash-alternatives," instead of

customarily liquid investment products – i.e., money market funds, treasury bills or FDIC-

insured savings accounts – without disclosing the inherent risks of the ARSs, which failed and

caused Plaintiffs and other members of the Class to sustain damages.  It is alleged that

---
[1]      Defendant CGCM is a wholly owned indirect subsidiary of Citigroup and was formerly known as Salomon
Smith Barney, Inc. ("Smith Barney").

Defendants' plan and scheme violated the Investment Advisers Act of 1940, New York General Business Law ("GBL") § 349 and Florida's Deceptive and Unfair Trade Practices Act (FDUTPA) Fla. Stat. § 501.201 *et seq.*, which prohibit deceptive acts or unfair practices, the Rules of the New York Stock Exchange ("NYSE") and the National Association of Securities Dealers ("NASD"), and constituted a breach of fiduciary duty, a breach of the implied covenants of good faith and fair dealing, common law negligence, negligent misrepresentation and unjust enrichment.

2.     In early-February 2008, the ARS market collapsed when failing auctions largely outnumbered auctions that succeeded, leaving ARS investors stranded with illiquid investments and their investments "frozen."

3.     As a result of Defendants' deceptive and manipulative marketing of ARSs, Plaintiffs and other members of the Class are now financially stranded with illiquid investments – deceptively marketed as "cash equivalents" – and are unable to meet immediate financial obligations and thus have been damaged, and those damages are continuing.

4.     This class action is brought on behalf of all Citigroup clients who have had cash invested into ARSs under the guise that these investments shared the same liquidity characteristics as cash (the "Class") between April 25, 2002, through present, inclusive ("Class Period").

5.     Plaintiffs' allegations are based upon knowledge as to themselves and upon information and belief based upon, among other things, the investigation of their attorneys, including a review of Defendants' public documents, filings with the United States Securities and Exchange Commission ("SEC"), applicable statutes, rules and regulations, communications by Defendants, and news articles and information readily obtainable on the Internet.

## JURISDICTION AND VENUE

6.    The claims asserted herein arise under and pursuant to alleged violations of Investment Advisers Act of 1940, 15 U.S.C. § 80-b-1 *et seq.*, GBL § 349, FDUTPA § 501.201 *et seq.*, breaches of fiduciary duty and the implied covenant of good faith and fair dealing, as well as common law negligence, negligent misrepresentation and unjust enrichment.

7.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, as one of the causes of action arose from Defendants' violation of federal law, *i.e.*, the Investment Advisers Act, 15 U.S.C. 80b-14. Additionally, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d) (diversity). Plaintiffs is a citizen of Florida and other members of the proposed Class numbering thousands are citizens of a State different from the Defendants. *See* 28 U.S.C. § 1332(d)(2)(A). The matter in controversy exceeds the sum of $5,000,000, exclusive of interests and costs. Defendants' numerous false and misleading public filings, use of the U.S. mail system, and use of the Internet in the pursuit of their illegal plan and scheme violated federal statutes, as well as GBL § 349, FDUPTA § 501.201 *et seq.* and the common law. To the extent the court has federal question jurisdiction, it also has supplemental jurisdiction over the state law claims.

8.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading public documents, disclosure statements, brochures and other information, occurred in this District. Further, venue is proper in this District pursuant to 15 U.S.C. § 80b-14. Each of the Defendants resides, is found, transacts business, or has an agent in this state and/or

3

this District. Defendants Citigroup and CGCM maintain offices located at 399 Park Avenue, New York, NY 10043, and 388 Greenwich Street, New York, New York 10013, respectively.

9.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, the internet and the facilities of the national securities markets.

## PARTIES

10.     Plaintiffs, Samuel A. Stockhamer and Alice L. Stockhamer, reside in Palm Beach County, Florida. Plaintiffs, at all times hereinafter mentioned, maintained and continue to maintain a Brokerage Account with Defendants. Plaintiffs, through and in reliance on Defendants' representations and their failure to inform Plaintiffs and members of the Class of the inherent risks of the ARSs, invested cash funds in three ARSs during the Class Period: Cohen & Steers Reit & Util Income Rate, Ing Clarion Global Real Estate-B and Ing Clarion Global Real Estate-C. Plaintiffs recently, and repeatedly, sought to sell their investment in this purported "Cash Alternative" but was advised that Defendant CGCM refused and would not redeem their investment for cash, and that their investments were "frozen."

11.     Defendant Citigroup, Inc. ("Citigroup") is a Delaware corporation with its principal offices at 399 Park Avenue, New York, NY 10043. Citigroup is a global, full-service financial firm that provides brokerage, investment banking and asset management services to its clients.

12.     Defendant Citigroup Global Capital Markets Inc. ("CGCM" or "Smith Barney") is a wholly owned indirect subsidiary of Citigroup and was formerly known as Salomon Smith Barney, Inc. CGCM's principal executive office is located at 388 Greenwich Street, New York,

New York 10013. CGCM is a registered broker-dealer and conducts its brokerage business under the name of Smith Barney. Citigroup controlled and directed the actions of CGCM in executing the scheme in which it defrauded its clients into investing in allegedly low-risk "cash alternative" investments known as ARSs, but which instead were and was also a principal financial beneficiary from the profits obtained from the execution of said scheme, including obtaining profits from lending and investing Plaintiffs' and other members of the Class' ARS invested funds for their own benefit.

<strong><u>PLAINTIFFS' CLASS ACTION ALLEGATIONS</u></strong>

13.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all Citigroup clients who have had cash invested into ARSs under the guise that these investments shared the same liquidity characteristics as cash (the "Class") without being warned of the inherent risks of failure and non performance of ARSs. Excluded from the Class are Defendants, the officers and directors of Citigroup, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

14.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is presently unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs reasonably believe that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Citigroup or its transfer agent and may be notified of the pendency of this action by mail, or the internet or publication using the form of notice similar to that customarily used in securities class actions.

5

15.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of statutory and common law complained of herein.

16.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained Schoengold, Sporn, Laitman & Lometti, P.C., counsel competent and experienced in class consumer and securities litigation.

17.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the Investment Advisers Act of 1940 was violated by Defendants' acts as alleged herein;

(b)    whether New York General Business Law § 349 was violated by Defendants' acts as alleged herein;

(c)    whether the Florida Deceptive and Unfair Trade Practices Act, *Fla. Stat.* § 501.201 *et seq.*, was violated by Defendants' acts as alleged herein;

(d)    whether Defendants' breached its fiduciary duties owed to Plaintiffs and other members of the Class;

(e)    whether Defendants' acts complained of herein were a breach of Defendants' implied covenants of good faith and fair dealing;

(f)    whether Defendants' acts complained of herein constituted negligence;

(g)    whether Defendants' violated NYSE and NASD Rules and/or failed to observe and warn of the risks associated with ARSs as stated in Financial Accounting Standards Board ("FASB") Rules FAS Nos. 95 and 115;

(h)     whether Defendants' statements and acts complained of herein constituted negligent misrepresentations;

(i)     whether Defendants have been unjustly enriched by the acts complained of herein; and,

(j)     to what extent Plaintiffs and members of the Class have sustained damages and the proper measure of damages.

18.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

19.     The term "auction rate security" typically refers to either municipal or corporate debt securities or preferred stocks which pay interest at rates set at periodic "auctions." Auction rate securities generally have long-term maturities of 30 years, though ARS' which are preferred stocks typically have no maturity date.

20.     The auction rate market was invented in 1984 by an investment banker at Lehman Brothers. The idea was to issue long-term securities that could pay their buyers interest rate only a little above short-term rates. That was accomplished by having periodic auctions to reset the rate. As long as the auction succeeded, meaning that there were willing bidders for the securities, any holder could sell the security at face value whenever there was an auction. If an

auction failed, the interest rate would rise to a penalty level that no company – or municipality – with decent credit would agree to pay for long.  That issuer would redeem the bonds.  So long as the auctions worked, the risk to buyers was that an issuer's credit would go bad and the buyer would be stuck with the bonds.   The first auctions were for auction-rate preferred stock, but the idea soon spread to municipal bonds and then to preferred shares issued by closed-end municipal bond funds.  If the auctions did not succeed, the additional risk was that the Plaintiffs and members of the Class would have their invested assets "frozen" and they would be unable to obtain their monies.

**Defendants State That Their "Relationships" With Clients
Are As "Financial Advisors," "Focused on You and Your Needs,"
<u>Holding Themselves Out As Investment Advisers and Fiduciaries</u>**

21.    Over the last several years, Defendants, through the investment of millions of advertising dollars and repeated explicit public representations, convinced Plaintiffs and members of the Class that Defendants act not merely as "stock brokers," but rather as "Financial Advisors" who provide a special relationship of trust and confidence, wherein the financial interests of the client come first.   Thus, Defendants held themselves out as professional "financial advisors," *i.e.*, investment advisers and fiduciaries, who specialized in lending and risk management.  For example, in a section of its web page called "Working with Your Financial Advisor," Citigroup emphasizes the importance in confiding and relying on the personal relationship with the Smith Barney Financial Advisor to guide the client through all of life's significant milestones:

> *Just as your life involves more than investments, so will your relationship with your Smith Barney Financial Advisor.*  It all starts with a conversation.  You might want to grab a chair, because *you'll be asked about your fondest aspirations for yourself and your family, your feelings about where you are and where you hope to be and, of course, your fears, and the things that might prevent you from getting what you want.*

Marriage      House        Family        Retirement          Legacy

**Know what matters most in life, and plan accordingly**

Your Financial Advisor will then work closely with Citigroup professionals who specialize in such disciplines as lending, risk management — and yes, even investments — *to craft a comprehensive wealth management plan* for your consideration.

There's much to discuss. Let's get to work.

(Emphasis added).

22.    Defendants also purported to have a range of expertise in "managing the wealth" of its clients. Specifically, Defendants states on their web site:

**Managing Your Wealth**

At Smith Barney we believe that managing your wealth is not just about having better answers, it's about asking better questions. *Those questions are the heart of a discovery process that will enable your Smith Barney Financial Advisor to learn enough about you, your family and your goals to design a holistic, strategic plan – a plan designed to help you protect and enhance the lifestyle you've worked so hard to earn.*

(Emphasis added).

23.    Defendants also specifically represented, that through its Financial Advisors, it engages in *"wealth management"* on behalf of its clients encompassing a whole range of "actionable" financial strategies to "realize your most cherished hopes and *defend against the things that might undo them*," as follows:

Wealth management can help you determine what's really important to you, then develop *actionable strategies to help you realize your most cherished hopes and defend against the things that might undo them.*

*Investments? Of course. Borrowing? Strategically, yes. Managing risk? Systematically. Planning deliberately so that your wealth works to bring you a lifestyle well earned? That's where it starts.*

(Emphasis added).

9

24.    Defendants touted its "Financial Management Account" ("FMA") as the "cornerstone" of its "wealth management" program as follows:

"Financial Management Account – *The cornerstone of your overall wealth management plan*, the Smith Barney FMA, our central asset account, *offers you better financial control*, access to funds and account information with greater flexibility and convenience.

(Emphasis added).

25.    In their advertising, Defendants has also repeatedly represented how it assists investors in reaching their financial goals and its ethical obligations to customers. For example, in and around 2004-2005, Defendants issued a television commercial campaign (known as "How We Earn It") that features characters portraying a retiree or businessperson describing how they reached financial security, followed by the Smith Barney taglines that "You work hard to earn it. Shouldn't your financial consultant?" and by "This is who we are. This is how we earn it."

26.    The aforementioned misrepresentations that Defendants' "Financial Advisors" have a special relationship of trust, loyalty and confidence with their clients such that the client interests comes first were repeated literally repeated thousands of time in print, television and other media and relied upon by Plaintiffs.

27.    The statements in the  paragraphs above, that Citigroup and its Financial Advisors will guide the client through all of life's milestones, craft a comprehensive wealth management plan, "manag[e] your wealth," design a create a strategic plan "designed to help you protect and enhance the lifestyle you've worked so hard to earn" and create "a comprehensive wealth management plan" "so that your wealth works to bring you a lifestyle well earned" are materially false and misleading since, *inter alia*, Smith Barney in fact abused its "relationship"

with its clients by falsely touting the ARSs as "cash alternatives" and "highly liquid" investments.

28.    Defendants' claimed allegiance to its customers is also set forth in a statement to customers entitled "Our Mutual Commitment," available on Citigroup's website. This statement was modeled from a "Statement of Investor Rights and Responsibilities" adopted by the Board of the Securities Industry Association in 2004.  In the Statement, Defendants outline their duties to customers, as follows:

**Your Rights as a Client**

**A client has the right to quality service, clear reporting, responsible investment advice and the prompt, fair resolution of problems.**

**Quality Service**

*To be treated in a fair, ethical and respectful manner in all interactions with Smith Barney, its employees and its affiliates.*

To receive competent, courteous service, and assistance, at a fair price.

\*        \*        \*

**Clear Reporting**

To receive clear, accurate, easy-to-understand descriptions of all your transactions, statements and other communications from Smith Barney.

*To be informed clearly about all the costs associated with your account and the costs related to individual transactions, including commissions, sales charges (or loads) and other fees.*

To receive accurate and timely regular statements of your account, including detailed transactional information.

\*        \*        \*

**Responsible Investment Guidance**

If desired, to be provided with appropriate investment guidance based on your personal objectives, time horizon, risk tolerance and any other factors you choose to disclose.

*To be apprised of significant conflicts of interest identified in a financial relationship between an investor and his or her Financial Advisor.*

(Emphasis added).

29.     Defendants' offering and investing of clients' funds in ARS' violated its "Commitment to Investors."

## Defendants' Involvement In The ARS Market

30.     The Citigroup Defendants, during the Class Period, were a leading underwriter in the $300 billion ARS market.  Citigroup's involvement in the ARS market had generated substantial revenue for Defendants.  In addition to its customary brokerage fees CGCM charges its clients in connection with their purchase or sale of ARSs, Citigroup collects additional fees in connection with running the auctions that re-set the weekly or monthly interest rates on the ARSs.

31.     Defendants, well-known and allegedly reputed investment and "Financial Advisors," engaged in a deceptive and misleading plan and scheme whereby Defendants violated the trust and confidence placed in them by their clients, and caused, allowed and permitted their clients who reposed confidence in them, to have their monies placed in ARSs", allegedly as good as cash, instead of customarily liquid investment products – *i.e.*, money market funds, treasury bills or FDIC-insured savings accounts – without disclosing the inherent risks of the ARS.

32.     Defendants aggressively, and albeit erroneously, marketed ARSs to their clients as "Cash Equivalents" or "Cash Alternatives" – just as good as cash.

## The SEC, Big Four Auditors and Accounting
## Regulators Scrutinize Accounting Treatment for ARS

33.     As reported in an article titled "Auction-Rate Securities: Hold that Gavel" in CFO.com on April 25, 2005, Big Four auditors, Ernst & Young ("E&Y"), in December 2004,

first began advising clients to reclassify ARSs as short-term investments and not "cash equivalents" as was the prior practice. E&Y's viewpoint was shared by the other Big Four audit companies and was endorsed by the Financial Accounting Standards Board ("FASB"), as follows:

\*        \*        \*

> Since December, when Ernst & Young first began advising clients to make the change, scores of CFOs have altered the accounting treatment for ARS. The new interpretation of two accounting standards is now endorsed by the Financial Accounting Standards Board, the Securities and Exchange Commission, and the Public Company Accounting Oversight Board, as well as all the Big Four auditors. (The reinterpreted standards are FAS No. 95, Statement of Cash Flows, and FAS No. 115, Accounting for Certain Investments in Debt and Equity Securities.)
>
> A current SEC probe of the auctions, in which investigators are reportedly looking into alleged "bid rigging" within the ARS market, doesn't appear to involve accounting treatment of the securities. But the investigation led some audit clients to reevaluate their investments and later question the accounting treatment, according to an audit manager who preferred not to be identified. **After taking another look at the accounting rules, each of the Big Four concluded that a wholesale reinterpretation of the standards was needed, and the audit firms passed the word to their clients.**
>
> The accounting change might turn out be the latest crimp in corporate treasurers' use of what's long been seen as an effective cash-management tool. **The securities are long-term municipal and corporate bonds (usually with 20-year to 30-year maturities) that are priced and traded like short-term debt.**
>
> **The reason for the resemblance to short-term debt is that ARS interest rates are reset through a Dutch auction.** In a Dutch auction, what sets the price is the bid with the lowest yield that would enable all the bonds in a single block to be sold. (A block of bonds is usually worth at least $200,000.) **Generally, the auctions are held every 7, 28, or 30 days, which gives finance executives a chance to liquidate their holdings when they need cash.**

(Emphasis added.)

34.    The SEC and the Public Company Accounting Oversight Board (PCAOB) have followed E&Y and the other auditors to "correct" the wrong application of accounting rules, as

they relate to ARSs.    As reported on February 28, 2005 article in iTreasurer.com titled "The

Brave New World of Regulatory Activism":

*       *       *

> Under reported pressure from the Public Company Accounting Oversight Board (PCAOB) and the SEC, audit firms have been revisiting decades-old (and apparently seldom read) literature on auction-rate securities—i.e., should they be counted as "cash equivalent" on the balance sheet or be classified as FAS 115 securities?
>
> **Waiting for the (third) shoe to drop**
> No one believes that the SEC and auditors are changing the rules. **The guidance on auction-rate securities, for example, dates back to the late 1980s.** And so far, the impact on corporate financials does not appear too dramatic. But these seemingly unrelated initiatives may be symptomatic of a common trend:
>
> "There's greater scrutiny of how companies apply existing accounting rules and how auditors are enforcing them," explains PricewaterhouseCoopers Senior Manager, Muneera Carr. In the wake of Enron and the Sarbanes-Oxley Act, "regulators are clearly playing a more active role."
>
> These latest moves are not the first show of standard-setters "activism." EITF 03-1 was also initially conceived as clarification of preexisting rules on impairment (SAB 59).
>
> Later, however, the FASB reconsidered whether indeed it was doing more than clearing up some old misconceptions. Perhaps more worrisome, however, the February initiatives are not going to be the last: As *International Treasurer* was going to press, sources said a third accounting "bombshell" was to drop; this one "would blow the other two out of the water," one accounting pro notes.
>
> **What if it walks like a duck. . .**
> Just how auction-rate securities suddenly reemerged as a hot issue is murky, and **this is not the first time there's been some discussion of whether they belong in the "cash equivalent" line on the balance sheet. The buzz is that the PCAOB raised the issue during a routine inspection of a local audit practice of a Big-Four audit firm. The disagreement was escalated to the SEC Staff. And the SEC reaffirmed the guidance present in auditing manuals—i.e., auction-rate securities may look and feel like cash, but they are in effect FAS 115 securities.**
>
> It's also not entirely clear why for years, companies have gone on classifying auction-rate securities as cash equivalents, and auditors accepted. (From a

practical standpoint, the securities are nearly always as liquid as cash and have little price risk, hence the designation.)

What's crystal clear is why this has become an issue—now. With SOX-driven focus on compliance, auditors are carefully monitoring clients' financials. And with years of rising cash assets, and declining returns, many corporates have turned to auction securities to enhance yield with little—if any—additional liquidity or market risk.

At stake, then, is where to put auction-rate securities, if the apparently prevalent "cash equivalent" classification under FAS 95 is wrong. And the worry among corporate treasurers is that the new balance sheet "geography" may adversely affect key liquidity ratios.

*Experts at E&Y and PwC say that the "cash-like" designation for auction-rate securities was almost never correct. For example, E&Y guidance dating back to 1991 explains why auction-securities should not be considered cash equivalents under FAS 95.*

(Emphasis added).

35.     Despite seemingly clear guidance from the SEC, the Big Four audit firms and the PCAOB, Defendants continued to market ARSs to Plaintiffs and other members of the Class as "Cash Alternatives" in violation of FAS No. 95 and FAS No. 115.

**February 2008 ARS-Market Collapse**

36.     In early-February 2008, the ARS market collapsed when failing auctions largely outnumbered auctions that succeeded, leaving ARS investors stranded with illiquid investments.

37.     As a result of the ARS market collapse in February 2008, Plaintiffs and other member of the Class were unable to sell their position in ARSs.   Unable to liquidate their ARSs holdings to cash, Plaintiffs and other members of the Class were unable to meet their current financial obligations sustaining hardship and damages and forcing them to consider other alternatives to free up cash to meet current financial obligations.

**Defendants Blatantly Violated NASD Requirement**
**That Financial Advisors Proposed Transactions Be "Suitable"**

38.    Defendant Citigroup is a member of the NYSE and the NASD.  As such, Defendant Citigroup and its wholly owned subsidiaries are bound by the Rules and Regulations which govern the conduct of such members.

39.    Defendants violated the bedrock principle of "know thy customer."  NYSE Rule 405, "Diligence as to Account" (commonly referred to as the "Know thy customer rule"), requires that "every member organization is required ... to (1) *Use due diligence to learn the essential facts relative to every customer*, every order, every cash or margin account ...." (Emphasis added).  In addition, NYSE Rule 342.17, "Review of communications with the public", states: "Members and member organizations must develop written policies and procedures that are appropriate for their business, their size, structure and customers in connection with the review of communications with the public relating to their business." Further, NYSE Rule 472, Communications With The Public, sub-section (i) "General Standards for All Communications", states, in pertinent part: *"No member organization shall utilize any communication which contains (i) any untrue statement or omission of a material fact or is otherwise false or misleading, ..."* and sub-section (j), "Specific Standards for Recommendations," states in part that "[a] recommendation (even though not labeled as a recommendation) must have a basis which can be substantiated as reasonable."

40.    Defendants' violated the most basic NASD requirement that the financial transactions proposed by "Financial Advisors" to their clients be *"suitable"* meaning that they met the *"customers' financial objectives."*  The false and deceptive marketing of ARSs as "Cash Alternatives" was clearly "unsuitable" and could only serve to meet only Defendants' financial objectives at their clients' expense.

41.    The NASD has also promulgated "suitability" rules governing a broker's

relationship with its customers. NASD Rule 2310 provides, *inter alia*, as follows:

### 2310. Recommendations to Customers (Suitability)

(a)    In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs.

(b)    Prior to the execution of a transaction recommended to a non-institutional customer, other than transactions with customers where investments are limited to money market mutual funds, a member shall make reasonable efforts to obtain information concerning:

   (1)    the customer's financial status;

   (2)    the customer's tax status;

   (3)    *the customer's investment objectives; and*

   (4)    *such other information used or considered to be reasonable by such member or registered representative in making recommendations to the customer.*

(Emphasis added).

42.    Defendants' conduct in connection with their marketing, consulting and advising Plaintiffs and other Class members regarding ARSs also violated NASD Interpretative Materials for Rule 2310, which mandate "fair dealing," with the public including the requirement to not issue fraudulent misrepresentations and omissions in connection with financial transactions:

### IM-2310-2. Fair Dealing with Customers

(a)(1)   *implicit in all member and registered representative relationships with customers and others is the fundamental responsibility for fair dealing.* Sales efforts must therefore be undertaken only on a basis that can be judged as being within the ethical standards of the Association's Rules, with *particular emphasis on the requirement to deal fairly with the public.*

(2)    this does not mean that legitimate sales efforts in the securities business are to be discouraged by requirements which do not take into account the variety

of circumstances which can enter into the member-customer relationship. *It does mean, however, that sales efforts must be judged on the basis of whether they can be reasonably said to represent fair treatment for the persons to whom the sales efforts are directed*, rather than on the argument that they result in profits to customers.

(Emphasis added).

## COUNT I

### Violation of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.*

43.     Plaintiffs repeat and reallege the allegations as set forth above as if set forth fully herein.

44.     Defendant CGCM is an investment adviser under the Investment Advisers Act, 15 U.S.C. § 80b-1 *et seq.*, who entered into express brokerage contact with Plaintiffs and other members of the Class. Defendant CGCM, for compensation, engages in the business of advising Plaintiffs and other members of the Class, either directly or through publications or writings, as to the value of "securities" or as to the advisability of investing in, purchasing, or selling "securities" as defined at 15 U.S.C. § 80b-2(11).

45.     The provision of an auction market is not incidental to the conduct of their usual brokerage business and Defendant CGCM receives special compensation therefore.

46.     Under the Investment Advisers Act, Defendant CGCM, as Investment Advisers, owed to Plaintiffs and other members of the Class a fiduciary duty to fully and fairly disclose to all material facts, and an affirmative obligation to employ reasonable care to avoid misleading clients.

47.     In breach of their fiduciary duties to Plaintiffs and other members of the Class and in violation of the Investment Adviser Act, Defendant CGCM made the above-described misrepresentations, concealment and omissions of material facts concerning their actions as

"Financial Advisors" to customers in connection with ARSs thereby deceiving Plaintiffs and other members of the Class with full knowledge that they were false and misleading and that Plaintiffs and other Class members' cash was not being invested in liquid securities – "Cash Alternatives" – just as good as cash.

48.    As a result of Defendant CGCM's breaches of fiduciary duties, Plaintiffs and other Class members' purchases, investments and/or acquisitions of ARSs are void under Section 15 of the Investment Advisers Act, 15 U.S.C. § 80b-15(b), which provides:

> Every contract made in violation of any provision of this title and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this title, or any rule, regulation, or order thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision.

49.    Further, Defendant Citigroup acquired rights under and was benefited by Defendant CGCM's acts and conduct as set forth above and had actual knowledge of the conduct engaged in by Defendant CGCM that violated the Investment Advisers Act.

50.    In addition to seeking a declaratory judgment that the ARSs transactions with Plaintiffs and the Class are void, Plaintiffs seek rescission, an accounting and restitution on behalf of the Class of all monies and fees wrongfully obtained by Defendants and disgorgement of all profits made by the Defendants due to their conduct in violation of the Investment Advisers Act.

## COUNT II

### Violation of the New York General Business Law § 349

51.    Plaintiffs repeat and reiterate the allegations as set forth above as if set forth fully herein.

52.    Section 349 of the New York's General Business Law states:

Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

53.    As set forth above, Defendants' deceptive, acts, practices, and the false representations and omissions to state material facts and risks made by Defendants to Plaintiffs and the other Class members in connection with their investment in ARSs were prepared and disseminated from New York in the course of conducting their business, trade and services in New York, including but not limited to all of the statements, mailings made in monthly brokerage statements and other public statements.    Defendants' statements, omissions and deceptive scheme, directed at consumers, misled Plaintiffs and other Class members. Defendants' misrepresentations and omissions were likely to mislead reasonable consumers acting reasonably under the circumstances.

54.    Defendants' conduct and actions, as described above, constitute deceptive business practices in violation of the GBL.

55.    The damages sustained by Plaintiffs and the other Class members were a direct and foreseeable result of, and were proximately caused by Defendants' deceptive business practices.

56.    As a result of Defendants' actions, Plaintiffs and other Class members have been injured and damaged in an amount to be determined at trial.

## COUNT III

### Violation of Florida's Deceptive and Unfair Trade Practices Act, *Fla. Stat.* § 501.201 *et seq.*

57.    Plaintiffs repeat and reiterate the allegations as set forth above as if set forth fully herein.

58.    This is a cause of action for violation of Florida's Deceptive and Unfair Trade Practices Act pursuant to *Fla. Stat.* § 501.201 *et seq.*

59.    Section 501.204 of the Florida Statute states:

Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

60.    The false statements made by Defendants that ARSs were as good as cash and were highly-liquid "cash alternatives" were false and therefore in violation of the Florida Statute.

61.    Such false statements constituted deceptive and unfair conduct by Citigroup and CGCM and resulted in damages including but not limited to lost profits and future profits of Plaintiffs and members of the Class.

62.    Pursuant to *Fla. Stat.* § 501.2105, Plaintiffs are entitled to its reasonable attorneys' fees and costs incurred with bringing this action.

## COUNT IV

### Breach of Fiduciary Duty

63.    Plaintiffs repeat and reiterate the allegations as set forth above as if set forth fully herein.

64.    Defendants, through their agents and representatives, held themselves out as financial advisors to Plaintiffs and other Class members, and as such owed fiduciary duties to Plaintiffs and the other Class members. The Defendants participated in a false and deceptive scheme which violated their fiduciary duties of loyalty and fair dealing owed to Plaintiffs and the Class by causing Plaintiffs and Class members' to invest their formerly liquid cash holdings into

21

ARSs, under the guise that ARSs were "cash alternatives" – safe, liquid investments, just as good as cash, even though such investments were wholly unsuitable under the NASD rules and failed to represent best execution under the rules, and were done solely in order to enhance their own profits at the Plaintiffs' and the Class' expense. The Defendants also violated their fiduciary duties of full and complete disclosure in that the investment was unsuitable for Plaintiffs and the Class, in addition to Defendants' failure to disclose the inherent conflicts of interest which existed.

65.    As a result of Defendants' breach of fiduciary duties, Plaintiffs and other members of the Class have suffered damage in the form of lost earnings on their funds, and Defendants have profited at Plaintiffs' and the Class's expense in an amount to be determined at trial. The damages sustained by Plaintiffs and other Class members were a direct and foreseeable result, and were proximately caused by, Defendants' breaches of their fiduciary duties.

66.    The Defendants' conduct was willful, wanton, and reckless. Based on the intentionally dishonest nature of the Defendants' conduct, which was directed at the Class and at the public generally, the Defendants should also be held liable to the Class for punitive damages, in an amount to be determined at trial.

## COUNT V

### Breach of the Implied Covenants of Good Faith and Fair Dealing

67.    Plaintiffs repeat and reiterate the allegations set forth above as though fully set forth herein.

68.    In connection with the retention of CGCM as a financial or investment advisor or broker-dealer, there is an implied covenant of good faith and fair dealing on the part of CGCM to

22

Plaintiffs and the Class.

69.     CGCM breached the covenant of good faith and fair dealing by, among other things, failing to make full and complete representations about the nature of ARSs at Plaintiffs' and the Class' expense.

70.     By reasons of the foregoing, Plaintiffs and other members of the Class are entitled to compensatory damages in the amount to be determined at trial.

71.     Defendants' conduct was willful, wanton, and reckless.   Based on the intentionally dishonest nature of Defendants' conduct, which was directed at the Class and at the public generally, the Defendants should be held liable to Plaintiffs and other Class members for actual damages as well as punitive damages in an amount to be determined at trial.

## COUNT VI

### Negligence

72.     Plaintiffs repeat and reiterate the allegations as set forth above as if set forth fully herein.

73.     The Defendants' advertising, touting and holding themselves out to be investment and financial advisors, owed to Plaintiffs and other Class members a duty of care concerning Defendants' consultation, direction and/or advice in connection with Plaintiffs and other Class members' investment in ARSs.

74.     The Defendants breached their duty of care, *inter alia*, by advising Plaintiffs and other Class members that ARS were "cash alternatives" – just as good as cash – and readily liquid investments.

75.     The Defendants' conduct as described herein was, at minimum, negligent.

76.     The damages sustained by Plaintiffs and the other Class members were a direct

and foreseeable result of, and were proximately caused by, Defendants' breaches of their duty and negligent conduct.

77.    As a result of the Defendants' actions, Plaintiffs and the other Class members have been damaged and injured, in an amount to be determined at trial.

## COUNT VII

### Negligent Misrepresentation

78.    Plaintiffs repeat and reiterate the allegations as set forth above as if set forth fully herein.

79.    Defendants' above-described misrepresentations and conduct in connection with Plaintiffs and other Class members investment in ARSs were false and misleading, in violation of their duties to Plaintiffs and the Class.

80.    Defendants were negligent in making the above-described misrepresentations, concealment and omissions of material facts.

81.    Defendants' misrepresentations and omissions concerning the ARS, including the liquidity risks inherent in ARSs and the proper designation of ARSs as short-term investment and not cash equivalents, were material in Plaintiffs' and the other Class members' decisions to include ARS as part of their cash management investment strategy.

82.    Plaintiffs and other Class members justifiably relied upon such misrepresentations, concealment and omissions to their damage and detriment.

83.    The damages sustained by Plaintiffs and the other Class members were a direct and foreseeable result of, and were proximately caused by, Defendants' misrepresentations, concealment and omissions.

84.    As a result of Defendants' actions, Plaintiffs and the other Class members have

24

been damaged and injured in an amount to be determined at trial.

## COUNT VIII

### Unjust Enrichment

85.     Plaintiffs repeat and reiterate the allegations as set forth above as if set forth fully herein.

86.     Plaintiffs and the other Class members entered into contracts with the Defendant CGCM to open and maintain brokerage accounts.

87.     Throughout the Class Period, the Defendants, by advising, consulting and/or directing their clients to invest, purchaser or acquire ARSs – in lieu of actual "cash alternatives," such as money market funds, FDIC-insured money market accounts, Treasury bills – caused Plaintiffs and other members of the Class to invest in ARSs, generating increased revenues for Defendants.  Defendant Citigroup has been unjustly enriched at the expense of and to the detriment of Plaintiffs and each member of the Class by collecting money to which they are not entitled.  Specifically, Defendant Citigroup was the recipient of substantial ill-gotten profits in connection with Defendant CGCM's underwriting of ARS issuances, dominant presence in the ARS auction-market and trading commissions and advisory fees generated from Plaintiffs and other Class members' investment in ARSs.

88.     Defendants should be required to disgorge this unjust enrichment.

**WHEREFORE**, Plaintiffs prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B.     Declaring that the Defendants' ARS transactions with the Plaintiffs and other

member of the Class are void, and granting rescission and restitution;

      C.     Awarding compensatory damages in favor of Plaintiffs and the other Class members against Defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

      D.     Seeking disgorgement of any and all monies Defendants realized from the ARS transactions with Plaintiffs and other member of the Class;

      E.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including interest, counsel fees and expert fees; and

      F.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:     New York, New York
             April 25, 2008

                      **SCHOENGOLD SPORN LAITMAN & LOMETTI , P.C.**

                      Samuel P. Sporn (SPS-4444)
                      Joel P. Laitman (JL-8177)
                      Frank R. Schirripa (FS-1960)
                      Daniel B. Rehns (DR-5506)
                      19 Fulton Street, Suite 406
                      New York, New York 10038
                      Telephone: (212) 964-0046
                      Facsimile (212) 267-8137

                      *Attorneys for Plaintiffs*