UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

SAMUEL A. STOCKHAMER and ALICE L.       :
STOCKHAMER, on Behalf of Themselves      :
and All Others Similarly Situated,        :
                                          :   No. 08-cv-3904 (LTS)
          Plaintiffs,                     :
                                          :   **ECF CASE**
                                          :
          v.                              :   **AMENDED CLASS ACTION**
                                          :   **COMPLAINT**
                                          :
CITIGROUP, INC. and CITIGROUP GLOBAL     :   **JURY TRIAL DEMANDED**
CAPITAL MARKETS, INC.                     :
                                          :
          Defendants.                     :

-------------------------------------------------------------x

## NATURE OF THE ACTION

1.    Plaintiffs Samuel A. Stockhamer and Alice L. Stockhamer, clients of Defendant Citigroup, Inc.'s ("Citigroup") brokerage subsidiary, Citigroup Global Capital Markets, Inc. ("CGCM" or "Smith Barney"),[1] bring this class action on behalf of themselves and all others similarly situated, by their attorneys, Schoengold Sporn Laitman & Lometti, P.C., for their class action complaint against Defendants Citigroup and CGCM, registered investment advisor under the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1, *et seq.* ("IAA"), (collectively, the "Defendants"). The action is brought on behalf of Smith Barney clients, as set forth more specifically herein, who have had the auction rate preferred stock or auction rate debt securities ("ARS") frozen by Defendants and have been damaged thereby.

2.    ARS are complex long-term debt securities where the yield or interest rate is reset at periodic auctions held every week or month at which time the instruments may also be sold. ARS are not traded on any national exchange. The liquidity of the ARS depended on the

---

[1]    Defendant CGCM is a wholly owned indirect subsidiary of Citigroup and was formerly known as Salomon Smith Barney, Inc. ("Smith Barney").

functioning of these auctions, and the auctions, in turn, depended on the continued participation of certain primary financial institutions who pledged to support them. Smith Barney pledged to act as a primary institution supporting the ARS auctions for Plaintiffs' ARS holdings. This auction participation yielded Smith Barney substantial special annual fees (which Smith Barney continues to receive even though, as alleged below, Smith Barney has ceased its participation in the auctions to the detriment of its clients).

3.      The investment of Plaintiffs' cash holdings in ARS was the result of a systematic advisory campaign engaged in by Smith Barney as Plaintiffs' Financial Advisors. Defendants' undisclosed motivation for this advisory campaign was for Smith Barney to obtain the substantial undisclosed auction related annual fees. Plaintiffs were approached by their Smith Barney "Financial Advisor" who proposed and recommended that they be given consent to invest Plaintiffs' cash holdings in ARS. Plaintiffs' Smith Barney Financial Advisors recommended ARS as a higher yielding "cash alternative" to other liquid investments such as money market funds. Smith Barney Financial Advisors failed to advise Plaintiffs and the Class of either the potential absence of liquidity attendant with ARS investments or any conflicts of interest between Plaintiffs' financial interests and those of Smith Barney in connection with the ARS. Further, Defendants conducted this advisory campaign without reference to or direction that Plaintiffs review any portion of ARS prospectuses or registration statements filed with the United States Securities and Exchange Commission ("SEC"). Plaintiffs and members of the applicable classes herein were thus induced to give their consent to their Smith Barney Financial Advisor to invest in ARS without being shown the applicable ARS's prospectuses or registration statements filed with the SEC and without being advised of the potential absence of liquidity attendant with the ARS investment or the fundamental conflicts of interest between their ARS

2

holdings and the activities of Smith Barney as a principal ARS auction participant.

4.     Further, independent of the above specific misstatements and omissions made by Smith Barney Financial Advisors to Plaintiffs in connection with the ARS, Defendants, as Plaintiffs' Financial Advisors, owed Plaintiffs and the Class duties *not* to act in a manner which undermined its clients' financial interests or advanced Smith Barney's financial interests at the expense of its clients.

5.     Beginning on or about February 13, 2008, Smith Barney determined that it was no longer in its own financial interest to continue participating in ARS auctions.  In breach of the duties owed to Plaintiffs as Financial Advisors, Defendants ceased all ARS auction participation. Smith Barney's actions ensured that the liquidity of their clients' ARS holdings was wiped out, causing Plaintiffs' ARS holdings to become frozen.

6.     Plaintiffs assert five causes of action arising from Defendants' misconduct alleged herein.  It is alleged CGCM violated the IAA (Count I) by, *inter alia*, misrepresenting the liquidity of the ARS investment, in failing to disclose liquidity risks and conflicts of interest attendant with the ARS investment (*e.g.*, ¶¶ 3, 33-34) ("misrepresentation and omission allegations") and for failing to participate in the ARS auctions in order to advance defendants' financial interests at its clients' expense (*e.g.*, ¶¶ 4, 38) ("breach of duty allegations").    In addition, Plaintiffs allege claims for breach of fiduciary duty against CGCM (Count II), aiding and abetting breach of fiduciary duty against Citigroup (Count III), breach of the implied covenants of good faith and fair dealing (Count IV) and negligence (Count V) against CGCM arising *exclusively* from the breach of duty allegations. Plaintiffs herein relied on Defendants' purported role as a trusted Financial Advisor as alleged herein.

3

7.    Plaintiffs' allegations are based upon knowledge as to themselves and upon information and belief based upon, among other things, the investigation of their attorneys, including, a review of Defendants' public documents, filings with the SEC, applicable statutes, rules and regulations, communications by Defendants, and news articles and information readily obtainable on the Internet.

## JURISDICTION AND VENUE

8.    The claims asserted herein arise under and pursuant to alleged violations of Investment Advisers Act of 1940, 15 U.S.C. § 80-b-1 *et seq.*, breaches of fiduciary duty and the implied covenants of good faith and fair dealing, and common law negligence.

9.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, as one of the causes of action arose from Defendants' violation of federal law, *i.e.*, the Investment Advisers Act, 15 U.S.C. 80b-14.  Additionally, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d) (diversity).  Plaintiffs are citizens of Florida and other members of the proposed Class numbering thousands are citizens of a State different from the Defendants.  *See* 28 U.S.C. § 1332(d)(2)(A).  The matter in controversy exceeds the sum of $5,000,000.00, exclusive of interests and costs. Defendants' numerous false and misleading public filings, use of the U.S. mail system, and use of the Internet in the pursuit of their illegal plan and scheme violated federal statutes and common law.  To the extent the court has federal question jurisdiction, it also has supplemental jurisdiction over the state law claims.

10.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading public documents, disclosure statements, brochures and other information,

occurred in this District. Further, venue is proper in this District pursuant to 15 U.S.C. § 80b-14. Each of the Defendants resides, is found, transacts business, or has an agent in this state and/or this District.   Defendants Citigroup and CGCM maintain offices located at 399 Park Avenue, New York, NY 10043, and 388 Greenwich Street, New York, New York 10013, respectively.

11.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, the internet and the facilities of the national securities markets.

## PARTIES

12.    Plaintiffs, Samuel A. Stockhamer and Alice L. Stockhamer, reside in Palm Beach County, Florida.   Plaintiffs, at all times hereinafter mentioned, maintained and continue to maintain a Brokerage Account with Defendants. Plaintiffs did not initiate investment in ARS. Instead Plaintiffs' Smith Barney Financial Advisor recommended, advised and falsely obtained Plaintiffs' consent to allow the investment advisor to invest $175,000 cash in the following ARS holdings:  Cohen & Steers Reit & Util Income Rate, Ing Clarion Global Real Estate-B and Ing Clarion Global Real Estate-C.  Citicorp was a primary participant in the auctions of these ARS at the time of purchase. In granting such consent to Citicorp to invest in ARS Plaintiffs relied on Defendants stated role as Plaintiffs' "Financial Advisor," including as set forth below ¶¶ 33-34. As a result of Defendants' breach of duty in failing to continue to participate in ARS auctions, all of Plaintiffs' ARS assets were frozen.

13.    Defendant Citigroup, Inc. ("Citigroup") is a Delaware corporation with its principal offices at 399 Park Avenue, New York, NY 10043.  Citigroup is a global, full-service financial firm that provides brokerage, investment banking and asset management services to its

clients. Citigroup was responsible for Defendants' website and representations, including those relating to the duties of Smith Barney Financial Advisors.

14.    Defendant Citigroup Global Capital Markets Inc. ("CGCM" or "Smith Barney") is a wholly owned indirect subsidiary of Citigroup and was formerly known as Salomon Smith Barney, Inc. CGCM's principal executive office is located at 388 Greenwich Street, New York, New York 10013. CGCM is a registered broker-dealer and conducts its brokerage business under the name of Smith Barney. Defendant CGCM, until the collapse of the ARS market had sustained an auction market for ARS. In order to maintain a fluid and efficient auction market, Defendant CGCM had a large proprietary inventory of ARS, and thus had a conflict of interest vis-à-vis Plaintiffs and the other members of the Class.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

15.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all Citigroup clients who have had cash invested into ARS under the guise that these investments shared the same liquidity characteristics as cash (the "Class") without being warned of the inherent risks of failure and non-performance of ARS. Excluded from the Class are Defendants, the officers and directors of Citigroup, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

16.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is presently unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs reasonably believe that there are thousands of members in the proposed Class. Record owners and other members

of the Class may be identified from records maintained by Citigroup or its transfer agent and may be notified of the pendency of this action by mail, or the Internet or publication using the form of notice similar to that customarily used in securities class actions.

17.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of statutory and common law complained of herein.

18.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained Schoengold, Sporn, Laitman & Lometti, P.C., counsel competent and experienced in class consumer and securities litigation.

19.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Investment Advisers Act of 1940 was violated by Defendants' acts as alleged herein;

(b)     whether Defendants' breached their fiduciary duties owed to Plaintiffs and other members of the Class, including by failing to participate in auctions, thereby wiping out the liquidity of Plaintiffs' ARS holdings;

(c)     whether Defendants' acts complained of herein were a breach of Defendants' implied covenants of good faith and fair dealing;

(d)     whether Defendants' acts complained of herein constituted negligence; and,

(e)     to what extent Plaintiffs and members of the Class have sustained damages and the proper measure of damages.

20.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

**Defendants Owed Duties To The Class**
**As Registered Investment Advisors**

21.    At all relevant times Smith Barney was a registered investment advisor.  As of March 28, 2008, Smith Barney registered in excess of 9,000 employees who performed investment advisory functions.  (*See* CGCM ADV Form, at 7).  Defendant Smith Barney provided "investment advisory services" to of 640,000 clients, of which in excess of 75% were individual clients, during 2007.  (*Id.*)

22.    Over the last several years, Defendants, through the investment of millions of advertising dollars and repeated explicit public representations, convinced Plaintiffs and members of the Class that Defendants act not merely as "stock brokers," but rather as "Financial Advisors" who provide a special relationship of trust and confidence, wherein the financial interests of the client come first.  Thus, Defendants held themselves out as professional "financial advisors," *i.e.,* investment advisors and fiduciaries, who specialized in lending and risk management.  For example, in a section of its web page called "Working with Your Financial Advisor," Citigroup emphasizes the importance in confiding and relying on the personal relationship with the Smith Barney Financial Advisor to guide the client through all of life's significant milestones:

*Just as your life involves more than investments, so will your relationship with your Smith Barney Financial Advisor.* It all starts with a conversation. You might want to grab a chair, because *you'll be asked about your fondest aspirations for yourself and your family, your feelings about where you are and where you hope to be and, of course, your fears, and the things that might prevent you from getting what you want.*

    Marriage    House    Family    Retirement    Legacy

**Know what matters most in life, and plan accordingly**

Your Financial Advisor will then work closely with Citigroup professionals who specialize in such disciplines as lending, risk management — and yes, even investments — *to craft a comprehensive wealth management plan* for your consideration.

There's much to discuss. Let's get to work.

(Emphasis added).

    23.    Defendants also purported to have a range of expertise in "managing the wealth" of its clients. Specifically, Defendants state on their web site:

**Managing Your Wealth**

At Smith Barney we believe that managing your wealth is not just about having better answers, it's about asking better questions. *Those questions are the heart of a discovery process that will enable your Smith Barney Financial Advisor to learn enough about you, your family and your goals to design a holistic, strategic plan – a plan designed to help you protect and enhance the lifestyle you've worked so hard to earn.*

(Emphasis added).

    24.    Defendants also specifically represented, that through its Financial Advisors, it engages in *"wealth management"* on behalf of its clients encompassing a whole range of "actionable" financial strategies to "realize your most cherished hopes and *defend against the things that might undo them,*" as follows:

Wealth management can help you determine what's really important to you, then develop *actionable strategies to help you realize your most cherished hopes and defend against the things that might undo them.*

9

*Investments?  Of course.  Borrowing?  Strategically, yes.  Managing risk?
Systematically.  Planning deliberately so that your wealth works to bring you a
lifestyle well earned?  That's where it starts.*

(Emphasis added).

25.    Defendants touted its "Financial Management Account" ("FMA") as the

"cornerstone" of its "wealth management" program as follows:

"Financial Management Account – *The cornerstone of your overall wealth
management plan*, the Smith Barney FMA, our central asset account, *offers you
better financial control*, access to funds and account information with greater
flexibility and convenience.

(Emphasis added).

26.    In their advertising, Defendants have also repeatedly represented how they assists

investors in reaching their financial goals and their ethical obligations to customers.  For

example, in and around 2004-2005, Defendants issued a television commercial campaign

(known as "How We Earn It") that featured characters portraying a retiree or businessperson

describing how they reached financial security, followed by the Smith Barney taglines that "You

work hard to earn it. Shouldn't your financial consultant?" and by "This is who we are. This is

how we earn it."

27.    The aforementioned misrepresentations that Defendants' "Financial Advisors"

have a special relationship of trust, loyalty and confidence with their clients such that the client

interests comes first were literally repeated thousands of time in print, television and other media

and relied upon by Plaintiffs.

28.    The statements in the  paragraphs above, that Citigroup and its Financial

Advisors will guide the client through all of life's milestones, craft a comprehensive wealth

management plan, "manag[e] your wealth," design a create a strategic plan "designed to help you

protect and enhance the lifestyle you've worked so hard to earn" and create "a comprehensive wealth management plan" "so that your wealth works to bring you a lifestyle well earned" are materially false and misleading since, *inter alia*, Smith Barney in fact abused its "relationship" with its clients by falsely touting the ARS as "cash alternatives" and "highly liquid" investments.

29.    Defendants' claimed allegiance to its customers is also set forth in a statement to customers entitled "Our Mutual Commitment," available on Citigroup's website.  This statement was modeled from a "Statement of Investor Rights and Responsibilities" adopted by the Board of the Securities Industry Association in 2004.  In the Statement, Defendants outline their duties to customers, as follows:

**Your Rights as a Client**

**A client has the right to quality service, clear reporting, responsible investment advice and the prompt, fair resolution of problems.**

**Quality Service**

*To be treated in a fair, ethical and respectful manner in all interactions with Smith Barney, its employees and its affiliates.*

To receive competent, courteous service, and assistance, at a fair price.

\*         \*         \*

**Clear Reporting**

To receive clear, accurate, easy-to-understand descriptions of all your transactions, statements and other communications from Smith Barney.

*To be informed clearly about all the costs associated with your account and the costs related to individual transactions, including commissions, sales charges (or loads) and other fees.*

To receive accurate and timely regular statements of your account, including detailed transactional information.

\*         \*         \*

11

### Responsible Investment Guidance

If desired, to be provided with appropriate investment guidance based on your personal objectives, time horizon, risk tolerance and any other factors you choose to disclose.

*To be apprised of significant conflicts of interest identified in a financial relationship between an investor and his or her Financial Advisor.*

(Emphasis added).

30.    Defendants' offering and investing of clients' funds in ARS violated their "Commitment to Investors."

### Defendants' Involvement In The ARS Market

31.    The ARS market emerged in 1984. It provided for safe investment in securities, either bonds or preferred stock issued by municipalities and other creditworthy institutions or public funds. The dividend or interest rate on these securities was reset at regularly scheduled auctions and these auctions also assured that if a holder wished to redeem or sell his holding he was able to do so. The liquidity of the ARS market was one of the principal benefits for ARS investors.

32.    The Citigroup Defendants, during the Class Period, were a leading underwriter in the $330 billion ARS market. Citigroup's involvement in the ARS market had generated substantial revenue for Defendants. In addition to its customary brokerage fees CGCM charges its clients in connection with their purchase or sale of ARS, Citigroup collects additional fees in connection with running the auctions that re-set the weekly or monthly interest rates on the ARS.

### Smith Barney's ARS Misstatements And Omissions As Financial Advisors

33.    Defendants engaged in a systematic advisory campaign as Plaintiffs' Financial Advisors promoting investment in ARS where Smith Barney served as one of the primary auction participants. Plaintiffs and the Class were approached by their Smith Barney Financial

12

Advisors and induced to give their consent for Smith Barney to invest Plaintiffs' cash holdings in ARS. Plaintiffs and the Class had no prior knowledge or understanding of ARS. Plaintiffs and the Class were not shown or directed to read any ARS prospectus, registration statement or other pertinent public filing. Plaintiffs and the Class were told that the ARS were as liquid as cash or money market funds such that the funds were accessible by Plaintiffs at all times. In addition, Plaintiffs' and other Class members' Smith Barney Financial Advisors stated that in addition to having the same liquidity as cash, the ARS had the advantage of earning higher yields than money market funds or other cash alternative investments. As a result of these materially false and misleading statements, as well as in reliance on their Financial Advisors' purported position to recommend investments to further their clients' financial interests, Plaintiff gave their Smith Barney Financial Advisor consent to invest in Smith Barney-supported ARS. Each month the Smith Barney client account statements received by Plaintiffs reinforced the misleading statements regarding ARS's liquidity by prominently describing the ARS as "cash alternatives."

34.    Defendants, acting as Plaintiffs' Financial Advisors, also failed to disclose to Plaintiffs and the Class the risk of illiquidity inherent in ARS in the event that primary auction participants, such as Smith Barney, failed to participate in ARS auctions and also failed to disclose conflicts of interest between Smith Barney and Plaintiffs.

**The SEC, Big Four Auditors and Accounting**
**Regulators Scrutinize Accounting Treatment for ARS**

35.    As reported in an article titled "Auction-Rate Securities: Hold that Gavel" in CFO.com on April 25, 2005, Big Four auditors, Ernst & Young ("E&Y"), in December 2004, first began advising clients to reclassify ARS as short-term investments and not "cash equivalents" as was the prior practice. E&Y's viewpoint was shared by the other Big Four audit companies and was endorsed by the Financial Accounting Standards Board ("FASB"), as

follows:

\*       \*       \*

Since December, when Ernst & Young first began advising clients to make the change, scores of CFOs have altered the accounting treatment for ARS. The new interpretation of two accounting standards is now endorsed by the Financial Accounting Standards Board, the Securities and Exchange Commission, and the Public Company Accounting Oversight Board, as well as all the Big Four auditors. (The reinterpreted standards are FAS No. 95, Statement of Cash Flows, and FAS No. 115, Accounting for Certain Investments in Debt and Equity Securities.)

A current SEC probe of the auctions, in which investigators are reportedly looking into alleged "bid rigging" within the ARS market, doesn't appear to involve accounting treatment of the securities. But the investigation led some audit clients to reevaluate their investments and later question the accounting treatment, according to an audit manager who preferred not to be identified. **After taking another look at the accounting rules, each of the Big Four concluded that a wholesale reinterpretation of the standards was needed, and the audit firms passed the word to their clients.**

The accounting change might turn out to be the latest crimp in corporate treasurers' use of what's long been seen as an effective cash-management tool. **The securities are long-term municipal and corporate bonds (usually with 20-year to 30-year maturities) that are priced and traded like short-term debt.**

**The reason for the resemblance to short-term debt is that ARS interest rates are reset through a Dutch auction.** In a Dutch auction, what sets the price is the bid with the lowest yield that would enable all the bonds in a single block to be sold. (A block of bonds is usually worth at least $200,000.) **Generally, the auctions are held every 7, 28, or 30 days, which gives finance executives a chance to liquidate their holdings when they need cash.**

(Emphasis added.)

36.    The SEC and the Public Company Accounting Oversight Board (PCAOB) have

followed E&Y and the other auditors to "correct" the wrong application of accounting rules, as

they relate to ARS.    As reported in the February 28, 2005 article on iTreasurer.com entitled

"The Brave New World of Regulatory Activism":

\*       \*       \*

Under reported pressure from the Public Company Accounting Oversight Board

(PCAOB) and the SEC, audit firms have been revisiting decades-old (and apparently seldom read) literature on auction-rate securities—i.e., should they be counted as "cash equivalent" on the balance sheet or be classified as FAS 115 securities?

### Waiting for the (third) shoe to drop

No one believes that the SEC and auditors are changing the rules. **The guidance on auction-rate securities, for example, dates back to the late 1980s.** And so far, the impact on corporate financials does not appear too dramatic. But these seemingly unrelated initiatives may be symptomatic of a common trend:

"There's greater scrutiny of how companies apply existing accounting rules and how auditors are enforcing them," explains PricewaterhouseCoopers Senior Manager, Muneera Carr. In the wake of Enron and the Sarbanes-Oxley Act, "regulators are clearly playing a more active role."

These latest moves are not the first show of standard-setters "activism." EITF 03-1 was also initially conceived as clarification of preexisting rules on impairment (SAB 59).

Later, however, the FASB reconsidered whether indeed it was doing more than clearing up some old misconceptions. Perhaps more worrisome, however, the February initiatives are not going to be the last: As *International Treasurer* was going to press, sources said a third accounting "bombshell" was to drop; this one "would blow the other two out of the water," one accounting pro notes.

### What if it walks like a duck. . .

Just how auction-rate securities suddenly reemerged as a hot issue is murky, and **this is not the first time there's been some discussion of whether they belong in the "cash equivalent" line on the balance sheet. The buzz is that the PCAOB raised the issue during a routine inspection of a local audit practice of a Big-Four audit firm. The disagreement was escalated to the SEC Staff. And the SEC reaffirmed the guidance present in auditing manuals—i.e., auction-rate securities may look and feel like cash, but they are in effect FAS 115 securities.**

It's also not entirely clear why for years, companies have gone on classifying auction-rate securities as cash equivalents, and auditors accepted. (From a practical standpoint, the securities are nearly always as liquid as cash and have little price risk, hence the designation.)

What's crystal clear is why this has become an issue—now. With SOX-driven focus on compliance, auditors are carefully monitoring clients' financials. And with years of rising cash assets, and declining returns, many corporates have turned to auction securities to enhance yield with little—if any—additional liquidity or market risk.

At stake, then, is where to put auction-rate securities, if the apparently prevalent "cash equivalent" classification under FAS 95 is wrong. And the worry among corporate treasurers is that the new balance sheet "geography" may adversely affect key liquidity ratios.

***Experts at E&Y and PwC say that the "cash-like" designation for auction-rate securities was almost never correct.*** For example, E&Y guidance dating back to 1991 explains why auction-securities should not be considered cash equivalents under FAS 95.

(Emphasis added).

37.    Despite seemingly clear guidance from the SEC, the Big Four audit firms and the PCAOB, Defendants continued to market ARS to Plaintiffs and other members of the Class as "Cash Alternatives" in violation of FAS No. 95 and FAS No. 115.

**Defendants' Duties As Financial Advisors**

38.    Acting as Plaintiffs' and other Class members' Financial Advisors and Investment Advisors under the IAA and as investment professionals bound by NASD rules described herein (¶¶ 48-52) and independent of any misstatements or omissions made to their clients in connection with ARS, Defendant Smith Barney was bound not to act in a manner which advanced Defendants' financial interests at the expense of its financial advisory clients or which directly undermined the financial interests of its advisory clients.

**Defendants Breached Their Duties To The Class By Wiping Out Liquidity of Plaintiffs' ARS Holdings In Order To Advance Smith Barney's Own Financial Interests**

39.    In early-February 2008, the Defendants breached their duties to Plaintiffs and the Class by failing to appear, provide bids and otherwise participate in the regularly scheduled auctions of Plaintiffs' ARS it had pledged to support. These actions resulted in the collapse of the ARS market and caused Plaintiffs' ARS to become illiquid investments or frozen.

40.    As a result of the ARS market collapse in February 2008, Plaintiffs and other

member of the Class could not sell their ARS holdings.  Unable to liquidate their ARS holdings to cash, Plaintiffs and other members of the Class were unable to meet their current financial obligations sustaining hardship and damages and forcing them to consider other alternatives to free up cash to meet current financial obligations.

41.    On February 26, 2008, *The Associated Press* issued an article entitled "Credit crunch turns Wall Street into a jungle," reported that investors and issuers, alike, "relied for years on the broker-dealer community supporting" the ARS auctions:

> Consider the auction-rate securities market, where municipalities, student-loan authorities and others issue debt with interest rates that reset every week to 35 days in bank-arranged auctions. Big banks like Citigroup Inc. and Goldman Sachs surprised debt investors recently when they decided not to backstop auctions of securities that garnered little demand by bidding for some of the debt themselves.
>
> "*We relied for years on the broker-dealer community supporting*" these securities auctions, says Paul Rosenstiel, deputy treasurer of California. *He said it was an "article of faith" that dealers would not let auctions fail. "We relied on and expected that kind of performance,*" he said.
>
> *          *          *
>
> "It's always been every investor for himself," says Mark Adelson, a principal of Adelson & Jacob Consulting LLC, which provides securitization consulting services. "*But their interests were not in conflict before and now they are.*"

(Emphasis added).

**Federal And State Regulatory Authorities Initiate Investigations**
**Into Smith Barney's Role In Auction Rate Securities Market Failure**

42.    A March 30, 2008 *New York Times* article entitled "If You Can't Sell, Good Luck" further exposed ARS broker-dealer's, like Smith Barney, deception and breach of fiduciary duties:

> *          *          *
>
> Investors in these securities almost certainly relied on their brokers' assurances that the [ARS] were safe and sound. That's because the sales were not accompanied by prospectuses outlining the risks.
>
> But the brokerage firms made more on these securities than they would have made on sales of money market funds.

17

43.    On April 8, 2008, *The Wall Street Journal* reported in an article entitled "Auction-Rate Securities Probed" that the SEC and the Financial Industry Regulatory Authority ("FINRA") are starting to look into how brokers sold ARS products:

> *As scores of investors complain they were misled into buying now-illiquid auction-rate securities, the Securities and Exchange Commission and the Financial Industry Regulatory Authority are starting to look into how brokers sold the products.*
>
> In a survey sent in recent weeks to financial companies, Finra seeks a breakdown of total auction-rate-securities holdings by customer type, how auction-rate securities are classified on customer statements, and how firms marketed the products. The regulator also asks how many customer complaints about auction-rate securities the firms have received since Oct. 1. A copy of the survey was reviewed by The Wall Street Journal.
>
> Finra also recently started a "sweep" investigation into the topic. A sweep investigation is a broad look at industry practices; it doesn't necessarily mean enforcement action will take place.
>
> *SEC spokesman John Heine said the agency is working with Finra to look into "representations made to investors when they purchased auction-rate securities."*
>
> *            *            *
>
> *Brokers had pitched auction-rate securities as liquid, super-safe investments with interest rates slightly superior to those of conventional money-market funds. Now investors are asking why they weren't warned about the possibility of failed auctions.*

(Emphasis added).

44.    On April 18, 2008, *The Wall Street Journal* reported in an article "Auction-Rate Debt Market Faces Probe" that New York Attorney General Andrew Cuomo had launched a broad investigation into auction rate securities and had subpoenaed Citigroup (Smith Barney) for information:

> Backlash is building against Wall Street for the credit crisis.
>
> The latest case: New York state's attorney general, Andrew Cuomo, has launched a broad investigation into auction-rate securities, instruments used by municipalities, schools, closed-end mutual funds and others to raise money.
>
> *Mr. Cuomo's office sent subpoenas to 18 institutions on Monday and Tuesday seeking information on their auction-rate-securities, including some of Wall*

*Street's biggest, such as* UBS AG, *Citigroup Inc.*, Merrill Lynch & Co., J.P. Morgan Chase & Co. and Goldman Sachs Group Inc., according to a person familiar with the investigation. The New York attorney general has plans to send out additional subpoenas soon, says the person.

*The $330 billion auction-rate market virtually collapsed in February when* demand for the securities dried up and *Wall Street firms stopped providing the support for the market they'd given in the past.*

When that happened, many issuers of the securities were faced with higher interest rates. Buyers of the securities -- often wealthy clients of the brokerages and corporations -- were left with instruments they thought were liquid but couldn't sell.

Mr. Cuomo's office considers the investigation an "industry case," meaning officials are looking into all aspects of the auction-rate business -- from what municipalities or other issuers were told about auction rates as methods of cheap financing all the way down to their distribution, sales and marketing to consumers who believed they were buying a safe and easily sold investment.

Jeff Tuller, a 55-year-old, commercial real-estate broker in New York City, says he can't access his money. He says he placed $300,000 in auction-rate securities in an account with J.P. Morgan Chase in April 2007 and November last year. He tried to liquidate about $200,000 in February to pay down a mortgage on a house in the Hamptons on Long Island, but says he was told there were no bids for the auctions and his money was stuck.

"I was very upset," he says.

J.P. Morgan Chase declined to comment.

Auction-rate securities are long-term instruments, but they have interest rates that reset weekly or monthly in a bidding process conducted by securities dealers. During a tumultuous February, investors stopped bidding in the auctions and the securities firms stopped stepping in with their own bids, as they had done in the past. Many bonds in failed auctions reset to higher interest rates. Others, depending on the terms of the bonds, reset to low rates.

State securities regulators are investigating auction rate securities as well, the North American Securities Administrators Association announced Thursday in a press release. Their efforts will be coordinated through a task force led by Massachusetts Securities Division director Bryan Lantagne. The task force includes members from Florida, Georgia, Illinois, Missouri, New Hampshire, New Jersey, Texas and Washington, according to the release.

Wall Street firms, many of which reported yet another round of write-downs and losses in the first quarter, have attempted to address their often-wealthy clients' woes. But, they have little capital available to work with, and they're dealing with investors whose patience is wearing thin.

Several lawsuits seeking class-action status also have been filed thus far.

UBS, Goldman Sachs and *Citigroup declined to comment.* A Merrill Lynch spokesman said it declines to comment on regulatory matters except to say it is company policy to cooperate with any investigations.

Municipal-bond newspaper Bond Buyer reported on Mr. Cuomo's investigation Wednesday.

Wall Street is facing backlash on many other fronts, from questions about how firms marketed and structured complex mortgage-backed securities to concerns about the high credit ratings attached to many of these instruments.

(Emphasis added).

45.    On April 24, 2008, it was reported in *The Wall Street Journal* article entitled "Wall Street Firms moved to Prevent Auction Failures" that Citigroup and others had struggled to keep auctions afloat late last year several months before the auction-rate securities market collapsed.

> *While the recent freeze in the auction-rate securities market struck many individual investors and their financial advisers as a surprise, Wall Street firms that marketed one type of auction security scrambled to prevent auction failures several months before the market collapsed.*
>
> *Several student-loan authorities say broker-dealers including UBS AG, Citigroup Inc. and Bank of America Corp. requested late last year that these authorities issue waivers that would make the auction-rate securities easier to sell. A broker-dealer is the firm responsible for recruiting buyers for the securities at the auctions.*
>
> The behind-the-scenes moves show broker-dealers were struggling to keep auctions afloat as some more-sophisticated investors such as corporate treasurers, spooked by problems in the credit markets, became reluctant to buy. *The moves raise questions about what Wall Street firms told their brokerage clients about risks emerging in the auction-rate security market. While alerting investors to warning signs could have accelerated the market's ultimate failure, firms' lack of action suggests Wall Street may have grappled with conflicted loyalties leading up to the collapse.*
>
> As fewer institutional investors stepped up to buy auction securities last year, Wall Street firms put their own capital behind the success of the auctions, purchasing securities that other investors didn't want.
>
> But many individual investors who bought at that time say they had no inkling of trouble brewing in the auction-rate market.
>
> "This was sold as totally liquid," says Marilyn Gales, an accountant in Long Beach, N.Y., who with her husband bought $375,000 in student-loan auction-rate securities through UBS on Feb. 11. "We were told nothing" about the waivers

being issued by loan authorities, she says. Investors who bought auction-rate securities through other firms have also complained about being told they were safe.

UBS, Citigroup and Bank of America each declined to answer questions posed in emails about how investment bankers advised student-loan issuers late last year and how they communicated with financial advisors and investors.

To be sure, several student-loan issuers say that, while Wall Street discussed strategies for dealing with the markets, few bankers believed those issues would erupt into widespread market failures, especially since auctions had functioned smoothly for two decades.

(Emphasis added).

### Auction Firms Reported To Continue To Reap
### Auction Fees While Failing to Participate In Auctions

46.    On May 4, 2008, *The New York Times* published an article entitled "How to Clear

A Road to Redemption" that exposed the clear conflict of interest for investment banks, like

Smith Barney, and the fees the investment banks continued to earn despite the fact that the

auctions were failing:

It is Day 79 in the hostage crisis otherwise known as the auction-rate securities market. Some $300 billion worth of investors' funds -- advertised as being easy as pie to cash in -- are still locked up. And the brokerage firms that got investors into this mess are doing little to help.

But investors trapped in these securities are not the only victims of this debacle; taxpayers are, too. That's because municipal issuers of auction-rate notes -- towns, school districts, hospitals, highway authorities and others -- are being asked to pay up to redeem and restructure the debt.

*Even as investors and taxpayers are hurt by this frozen market, Wall Street is making money from it. In fact, the auction-rate securities mess is another illustration of damaging conflicts of interest at the nation's big brokerage firms.*

Auction-rate securities are debt obligations issued by municipalities, nonprofit entities and closed-end mutual funds. Interest rates on the securities are set by periodic auctions, based on investor demand. The market froze in February when buyers disappeared, and brokerage firms refused to step in.

*Naturally, investment bankers who agreed to operate these auctions were paid for their services: 0.25 percent of the security's total issue for each year of its life. Unnaturally, big firms still earn these fees even though 70 percent of the weekly auctions of these securities are failing.*

*The firms also rake in banking fees when municipal issuers redeem the securities. They haul in another round of revenue when they help issuers unwind derivative contracts that are often intertwined with the securities.* These derivatives were designed to reduce costs for the issuers by hedging their interest rate risks. Thanks to the decline in interest rates, however, they can be frightfully expensive to unspool.

By my arithmetic, that's Wall Street 3, Investors/Issuers 0.

Sure, investors get interest on their money -- but nowhere near enough to compensate for being stuck in their holdings.

(Emphasis added).

### Smith Barney Offers Clients Loans With Interest On Their Frozen Assets To Continue To Profit From Failed ARS Market

47.    On May 5, 2008, *Investment News* published an article entitled "Brokerage firms struggle to finance auction-rate loans; Regulators provide some capital relief, but bank lenders balk," and reported Smith Barney would offer loans to its clients against ARS holdings at "a preferred interest rate."

*        *        *

*Retail brokers who have clients locked up in auction-rate securities generally aren't happy with the rates clients have to pay to borrow against their holdings.*

*They feel their firms have backed away from an implicit promise to ensure liquidity for these long-term securities that were sold as short-term, liquid investments.*

Brokers say customers should get a break. "It seemed like the interest rate was going to be fairly high," a broker at Wachovia Securities LLC of St. Louis said about the firm's loan program. "It didn't seem very attractive," said the representative, who asked not to be identified.

*        *        *

*Smith Barney, the brokerage unit of Citigroup Inc., of New York, also continues to offer loans at a preferred interest rate,* said spokesman Alexander Samuelson, who declined to comment further.

(Emphasis added).

**Defendants Blatantly Violated NASD Requirement**
**That Financial Advisors Proposed Transactions Be "Suitable"**

48.     Defendant Citigroup is a member of the NYSE and the NASD.    As such, Defendant Citigroup and its wholly owned subsidiaries are bound by the Rules and Regulations which govern the conduct of such members.

49.     Defendants violated the bedrock principle of "know thy customer." NYSE Rule 405, "Diligence as to Account" (commonly referred to as the "Know thy customer rule"), requires that "every member organization is required ... to (1) *Use due diligence to learn the essential facts relative to every customer*, every order, every cash or margin account ...." (Emphasis added).  In addition, NYSE Rule 342.17, "Review of communications with the public", states: "Members and member organizations must develop written policies and procedures that are appropriate for their business, their size, structure and customers in connection with the review of communications with the public relating to their business." Further, NYSE Rule 472, Communications With The Public, sub-section (i) "General Standards for All Communications", states, in pertinent part: "*No member organization shall utilize any communication which contains (i) any untrue statement or omission of a material fact or is otherwise false or misleading,* ..." and sub-section (j), "Specific Standards for Recommendations," states in part that "[a] recommendation (even though not labeled as a recommendation) must have a basis which can be substantiated as reasonable."

50.     Defendants' violated the most basic NASD requirement that the financial transactions proposed by "Financial Advisors" to their clients be "*suitable*" meaning that they meet the "*customers' financial objectives.*"  The false and deceptive marketing of ARS as "Cash Alternatives" was clearly "unsuitable" and could only serve to meet only Defendants' financial objectives at their clients' expense.

51.    The NASD has also promulgated "suitability" rules governing a broker's relationship with its customers.  NASD Rule 2310 provides, *inter alia*, as follows:

**2310. Recommendations to Customers (Suitability)**

(a)    In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs.

(b)    Prior to the execution of a transaction recommended to a non-institutional customer, other than transactions with customers where investments are limited to money market mutual funds, a member shall make reasonable efforts to obtain information concerning:

    (1)    the customer's financial status;

    (2)    the customer's tax status;

    (3)    *the customer's investment objectives; and*

    (4)    *such other information used or considered to be reasonable by such member or registered representative in making recommendations to the customer.*

(Emphasis added).

52.    Defendants' conduct in connection with their marketing, consulting and advising Plaintiffs and other Class members regarding ARS also violated NASD Interpretative Materials for Rule 2310, which mandates "fair dealing" with the public including the requirement to not issue fraudulent misrepresentations and omissions in connection with financial transactions:

**IM-2310-2. Fair Dealing with Customers**

(a)(1)  *implicit in all member and registered representative relationships with customers and others is the fundamental responsibility for fair dealing.* Sales efforts must therefore be undertaken only on a basis that can be judged as being within the ethical standards of the Association's Rules, with *particular emphasis on the requirement to deal fairly with the public.*

24

(2)    this does not mean that legitimate sales efforts in the securities business are to be discouraged by requirements which do not take into account the variety of circumstances which can enter into the member-customer relationship. *It does mean, however, that sales efforts must be judged on the basis of whether they can be reasonably said to represent fair treatment for the persons to whom the sales efforts are directed,* rather than on the argument that they result in profits to customers.

(Emphasis added).

## COUNT I

### Violation of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.*
### (Against Defendant CGCM)

53.    Plaintiffs repeat and reallege the allegations as set forth above as if set forth fully herein.

54.    Defendant CGCM is an investment adviser under the Investment Advisers Act, 15 U.S.C. § 80b-1 *et seq.*, who entered into express brokerage contact with Plaintiffs and other members of the Class.  Defendant CGCM, for compensation, engages in the business of advising Plaintiffs and other members of the Class, either directly or through publications or writings, as to the value of "securities" or as to the advisability of investing in, purchasing, or selling "securities" as defined at 15 U.S.C. § 80b-2(11).

55.  The provision of an auction market by CGCM and the fees obtained as a result thereof are not incidental to the conduct of their usual brokerage business and Defendant CGCM receives special compensation therefore.

56.  Under the Investment Advisers Act, Defendant CGCM, as Investment Advisers, owed to Plaintiffs and other members of the Class a fiduciary duty to not place their own interests before those of their clients, to refrain from any conflicts of interest and an affirmative obligation to employ reasonable care in serving their clients' financial interests.

25

57.    In breach of its duties, CGCM misrepresented that the ARS market was as liquid as a cash investment; failed to disclose the conflicts of interest inherent in the ARS investment and that the liquidity of the ARS investment depended on CGCM acting for the benefit of their clients as opposed to those of CGCM itself.  In further breach of their fiduciary duties to Plaintiffs and other members of the Class in violation of the Investment Adviser Act, Defendant CGCM failed to continue to support Plaintiffs' ARS by failing to appear, provide bids and otherwise participate in regularly scheduled ARS auctions wiping out the liquidity of Plaintiffs' ARS holdings.

58.    As a result of Defendant CGCM's breaches of fiduciary duties, Plaintiffs and other Class members' purchases, investments and/or acquisitions of ARS are void under Section 15 of the Investment Advisers Act, 15 U.S.C. § 80b-15(b), which provides:

> Every contract made in violation of any provision of this title and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this title, or any rule, regulation, or order thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision.

59.    In addition to seeking a declaratory judgment that the ARS transactions with Plaintiffs and the Class are void, Plaintiffs seek rescission, an accounting and restitution on behalf of the Class of all monies and fees wrongfully obtained by Defendants and disgorgement of all profits made by the Defendants due to their conduct in violation of the Investment Advisers Act.

## COUNT II

### Breach of Fiduciary Duty
(Against Defendant CGCM)

60.    Plaintiffs repeat and reiterate the allegations as set forth above as if set forth fully herein.

61.    Defendants, through their agents and representatives, held themselves out as financial advisors to Plaintiffs and other Class members, and as such owed fiduciary duties to Plaintiffs and the other Class members.  The Defendants breached their fiduciary duties by failing to continue to support Plaintiffs' ARS by failing to appear, provide bids and otherwise participate in regularly scheduled ARS auctions, thereby freezing the ARS holdings of Plaintiffs and the Class in order to advance the financial interests of Defendants at their clients' expense.

62.    As a result of Defendants' breach of fiduciary duties, Plaintiffs and other members of the Class have suffered damage in the form of lost earnings on their funds, and Defendants have profited at Plaintiffs' and the Class's expense in an amount to be determined at trial.  The damages sustained by Plaintiffs and other Class members were a direct and foreseeable result, and were proximately caused by, Defendants' breaches of their fiduciary duties.

63.    The Defendants' conduct was willful, wanton, and reckless.  Based on the intentionally dishonest nature of the Defendants' conduct, which was directed at the Class and at the public generally, the Defendants should also be held liable to the Class for punitive damages, in an amount to be determined at trial.

## COUNT III

### Aiding and Abetting Breach of Fiduciary Duty
(Against Defendant Citigroup)

64.    Plaintiffs repeat and reiterate the allegations as set forth above.  This cause of action arises solely from allegations of alleged breach of fiduciary duties owed to Plaintiffs and other Class members.

65.    As set forth above, Defendant CGCM breached its fiduciary duties to Plaintiffs and the Class.

66.    Defendant Citigroup, for its financial benefit, knew of, knowingly induced or participated in, permitted, and provided substantial assistance to, the fiduciary breaches by its subsidiary brokerage and by, *inter alia*, orchestrating and directing Defendant CGCM to participate in the ARS market, and reviewing and approving or ratifying CGCM's decision to fail to continue to support Plaintiffs' ARS by not  appearing, providing bids and otherwise participating in such regularly scheduled ARS auctions, thereby freezing the ARS holdings of Plaintiffs and the Class in order to advance the financial interests of Defendants.

67.    The damages sustained by Plaintiffs and the Class were a direct and foreseeable result of, and were proximately caused by Defendant Citigroup's aiding and abetting conduct.

68.    As a result of Defendant Citigroup's actions, Plaintiffs and the other members of the Class have been damaged and injured, and Defendant Citigroup's and their subsidiaries have been unjustly benefited, in an amount to be determined at trial.

69.    Defendant Citigroup's conduct was willful, wanton, and reckless.  Based on the intentionally dishonest nature of Defendant Citigroup's conduct, which was directed at the Class and at the public generally, Defendant Citigroup should also be held liable to the Class for punitive damages in an amount to be determined at trial.

## COUNT IV

### Breach of the Implied Covenants of Good Faith and Fair Dealing
(Against Defendant CGCM)

70.    Plaintiffs repeat and reiterate the allegations set forth above as though fully set forth herein.

71.    In connection with the retention of CGCM as a financial or investment advisor or broker-dealer, there is an implied covenant of good faith and fair dealing on the part of CGCM to Plaintiffs and the Class.

72.    CGCM breached the covenant of good faith and fair dealing by, among other things, failing to continue to support Plaintiffs' ARS by failing to appear, provide bids and otherwise participate in regularly scheduled ARS auctions, thereby freezing Plaintiffs' ARS holdings of the Class in order to advance the financial interests of defendants at their clients' expense.

73.    Based on the foregoing reasons, Plaintiffs and other members of the Class are entitled to compensatory damages in the amount to be determined at trial.

74.    Defendants' conduct was willful, wanton, and reckless.    Based on the intentionally dishonest nature of Defendants' conduct, which was directed at the Class and at the public generally, the Defendants should be held liable to Plaintiffs and other Class members for actual damages as well as punitive damages in an amount to be determined at trial.

## COUNT V

### Negligence

75.    Plaintiffs repeat and reiterate the allegations as set forth above as if set forth fully herein.

76.    The Defendants held themselves out to be investment and financial advisors, owed to Plaintiffs and other Class members a duty of care including not to take steps to

undermine the liquidity of Plaintiffs and other Class members ARS holdings and to continue to participate in regularly scheduled ARS auctions.

77.     The Defendants breached their duty of care, *inter alia*, by failing to continue to support Plaintiffs' ARS by failing to appear, provide bids and otherwise participate in regularly scheduled ARS auctions, thereby wiping out the liquidity of the Class in order to advance the financial interests of defendants at their clients' expense.

78.     The Defendants' conduct as described herein was, at minimum, negligent.

79.     The damages sustained by Plaintiffs and the other Class members were a direct and foreseeable result of, and were proximately caused by, Defendants' breaches of their duty and negligent conduct.

80.     As a result of the Defendants' actions, Plaintiffs and the other Class members have been damaged and injured, in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B.     Declaring that the Defendants' ARS transactions with the Plaintiffs and other member of the Class are void, and granting rescission and restitution;

C.     Awarding compensatory damages in favor of Plaintiffs and the other Class members against Defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.     Seeking disgorgement of any and all monies Defendants realized from the ARS transactions with Plaintiffs and other member of the Class;

E.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including interest, counsel fees and expert fees; and

F.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:    New York, New York
        June 13, 2008

**SCHOENGOLD SPORN LAITMAN & LOMETTI , P.C.**

Samuel P. Sporn (SPS-4444)
Joel P. Laitman (JL-8177)
Frank R. Schirripa (FS-1960)
Daniel B. Rehns (DR-5506)
19 Fulton Street, Suite 406
New York, New York 10038
Telephone: (212) 964-0046
Facsimile (212) 267-8137

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Frank R. Schirripa, Esq., one of the counsel for Plaintiffs in the above-referenced action, hereby certify that on June 13, 2008, I filed Plaintiffs' Amended Class Action Complaint with the Clerk of the Court, emailed a copy of Plaintiffs' Amended Class Action Complaint to the Southern District of New York ECF clerk and served a copy of Plaintiffs' Amended Class Action Complaint by electronic mail and first class mail on Defendants' counsel listed below:

**PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP**

Brad S. Karp, Esq.
Charles E. Davidow, Esq.
Susanna M. Buergel, Esq.
1285 Avenue of the Americas
New York, New York 10019-6064
Tel.: (212) 373-3000
Fax: (212) 757-3980

*Attorneys for Defendants Citigroup and
Citigroup Global Capital Markets, Inc.*

Frank R. Schirripa